**STATE of Minnesota, Respondent,**

v.

**Cortney John EDSTROM, Appellant.**

**A16-1382**

Court of Appeals of Minnesota.

Filed September 5, 2017

Lori Swanson, Attorney General, St. Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Elizabeth R. Johnston, Assistant County Attorney, Minneapolis, Minnesota (for respondent).

Cathryn Middlebrook, Chief Appellate Public Defender, Stan Keillor, Special Assistant Public Defender, St. Paul, Minnesota (for appellant).

Considered and decided by Rodenberg, Presiding Judge; Reilly, Judge; and Klaphake, Judge.*

## OPINION

KLAPHAKE, Judge

Appellant challenges the district court's denial of his motion to suppress evidence seized in the search of the apartment, ar-

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

guing that the warrantless use of a narcotics-detection dog at the apartment door was unlawful and tainted the subsequent search warrant. We conclude that the use of a narcotics-detection dog at an apartment door inside a secured apartment building implicates a legitimate expectation of privacy that constitutes a search requiring a warrant. Because the result of the dog sniff was essential to probable cause for issuance of the search warrant, we reverse and remand.

## FACTS

In October 2015, Hopkins Police Sergeant Erik Husevold received a tip from a confidential informant that appellant Cortney John Edstrom was selling "a substantial amount of methamphetamine out of an apartment in Brooklyn Park." The informant identified the location of the apartment building and stated that Edstrom lived on the third floor, drove a black Cadillac Deville sedan, and had possessed a pistol in the last three months. The informant knew that Edstrom was a convicted felon and believed he also owned a shotgun. Sergeant Husevold located a photograph of Edstrom on the Minnesota Department of Vehicle Services website, which indicated that he owned a black Cadillac Deville sedan, and the informant positively identified Edstrom from the photograph as the person who was selling methamphetamine.

Sergeant Husevold further investigated the informant's tip by going to the apartment building and obtaining a directory list for every resident on the third floor. He learned that Edstrom listed S.G. as his emergency contact in 2014 when he was in custody on an unrelated matter and that S.G. resided in an apartment on the third floor of the building. Based on this information, Sergeant Husevold directed Officer Tim Olson to use his narcotics-detection dog to examine apartment doors on the third floor from the common hallway of the apartment building. Officer Olson's narcotics-detection dog is certified and trained to detect and positively indicate the odor of various narcotics, including methamphetamine.

The apartment building is secured, but property management maintains a lockbox, called a Knox box, with a building key inside that enables law enforcement to access the building. Sergeant Husevold and Officer Olson entered the apartment building after a Brooklyn Park police officer obtained the entryway key from the Knox box and gave it to Sergeant Husevold. Officer Olson's narcotics-detection dog provided a positive alert for the presence of narcotics at the door to S.G.'s apartment. The narcotics-detection dog examined other apartment doors on the third floor but did not provide a positive alert at any other door.

Based on this information, Sergeant Husevold applied for a nighttime, unannounced warrant to search S.G.'s apartment. The district court issued the warrant to search S.G.'s apartment, and police officers executed the search on October 8, 2015. They recovered 226.65 grams of methamphetamine, multiple firearms, shotgun shells and rounds, and several digital scales with methamphetamine residue. They also seized Edstrom, who was inside the apartment.

The state charged Edstrom with first-degree sale of a controlled substance, in violation of Minn. Stat. § 152.021, subd. 1(1) (2014); first-degree possession of a controlled substance, in violation of Minn. Stat. § 152.021, subd. 2(a)(1) (2014); and possession of a firearm by an ineligible person, in violation of Minn. Stat. § 624.713, subd. 1(2) (Supp. 2015).

In March 2016, Edstrom moved to suppress the methamphetamine and firearms

that were obtained from the warrantless use of the narcotics-detection dog and subsequent search warrant. At the suppression hearing, he claimed that the warrantless search by a narcotics-detection dog at the apartment door was unconstitutional because the "actual door leading into the home" is clearly curtilage and that he had a reasonable expectation of privacy "at the door" or "at the seams of the door."

The district court denied Edstrom's motion to suppress, concluding that a narcotics-detection dog sniffing at an apartment door was permissible because Sergeant Husevold had "a legitimate reason for being in the common hallway on the third floor" and the area immediately outside an apartment door is not curtilage for purposes of the Fourth Amendment because it is a common area accessible to all residents, their guests, and anyone else who has entered the building legitimately, including law enforcement.

The matter proceeded to trial, and the jury found Edstrom guilty of first-degree possession of a controlled substance and possession of a firearm by an ineligible person. The jury found him not guilty of first-degree sale of methamphetamine. This appeal follows.

## ISSUE

Did the district court err in determining that the use of a narcotics-detection dog at the door of an apartment inside a secured, multi-unit apartment building is not a search for purposes of the United States and Minnesota Constitutions?

## ANALYSIS

Edstrom challenges the district court's denial of his motion to suppress evidence, relying heavily on *Florida v. Jardines*, 569

U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013), and its effect on Fourth Amendment law. He contends that the police officers' warrantless use of a narcotics-detection dog *at an apartment door* inside a secured, multi-unit residential building was unconstitutional.[1] Specifically, Edstrom contends that: (1) the narcotics-detection dog's examination of the apartment door was an unlawful physical intrusion; and (2) that the use of the narcotics-detection dog outside the apartment door violated an area in which he had a legitimate expectation of privacy.

"When reviewing a district court's pretrial order on a motion to suppress evidence, 'we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo.'" *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (quoting *State v. Jordan*, 742 N.W.2d 149, 152 (Minn. 2007)).

The United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Minnesota Constitution contains similar language. Minn. Const. art. I, § 10. "[T]he Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). "At the very core stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961). And "when it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 569 U.S. at 6, 133 S.Ct. at 1414. The United States Supreme Court has identified the scope of the Fourth Amendment's protection in two

---

1. In this appeal, Edstrom does not challenge the police officers' warrantless entry and presence in the common hallway of the secured, multi-unit residential building.

ways. First, it protects people "[w]hen the Government obtains information by physically intruding on persons, houses, papers, or effects." *Id.* at 5, 133 S.Ct. at 1414 (quotation omitted). Second, it "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Place*, 462 U.S. 696, 706-07, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (quotation omitted). Minnesota courts have applied similar standards to warrantless searches under article I, section 10, of the Minnesota Constitution. *See, e.g., State v. Davis*, 732 N.W.2d 173 (Minn. 2007); *State v. Carter*, 697 N.W.2d 199, 206-11 (Minn. 2005).

### A. Curtilage

We first consider whether the police officers' use of a narcotics-detection dog at the apartment door was a physical intrusion into a constitutionally protected area. *See Jardines*, 569 U.S. at 5, 133 S.Ct. at 1414. Edstrom argues that an apartment door is curtilage as a matter of law and that the traditional test for curtilage does not apply to apartment buildings. *See United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). The state argues that this court's decision in *State v. Luhm*, 880 N.W.2d 606 (Minn. App. 2016), is dispositive.

■■■ "[T]he area immediately surrounding and associated with the home—what our cases call the curtilage—[is] part of the home itself for Fourth Amendment purposes." *Jardines*, 569 U.S. at 6, 133 S.Ct. at 1414 (quotations omitted). Four factors help define the extent of a home's curtilage: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation

by people passing by." *Dunn*, 480 U.S. at 301, 107 S.Ct. at 1139. But the overarching purpose is to determine "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301, 107 S.Ct. at 1140.

In *Jardines*, the United States Supreme Court considered whether police officers' warrantless use of a narcotics-detection dog on the front porch of a home was unlawful. 569 U.S. at 5, 133 S.Ct. at 1413. The Court concluded that a home's front porch undoubtedly fits the definition of curtilage. *Id.* at 7, 133 S.Ct. at 1415. It reasoned that the concept of curtilage is "familiar enough that it is easily understood from our daily experience." *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 182 n.12, 104 S.Ct. 1735, 1743, n.12, 80 L.Ed.2d 214 (1984) (quotation marks omitted)).

Guided by *Jardines*, this court recently applied the *Dunn* factors to analyze whether the area immediately outside a resident's door in a secured, multi-unit condominium is curtilage for Fourth Amendment purposes. *Luhm*, 880 N.W.2d at 615-18. We reasoned that a majority of the factors weighed against a conclusion that this area was curtilage, even though the area is in close proximity to the home, because the area was not enclosed and the area was visible to anyone who might walk by. *Id.* at 617. We concluded, "The area immediately outside the door of a condominium unit in a secured, multi-unit condominium building is not curtilage for purposes of the Fourth Amendment to the United States Constitution so as to preclude a law-enforcement officer from conducting a warrantless dog sniff in that area." *Id.* at 609.

■■■ Edstrom contends that our analysis of the *Dunn* factors in *Luhm* is "un-

duly restrictive" because the "presence of an exterior wall in the apartment building eliminates the need for or the practicality of" an enclosure and dwellers of a secured apartment building maintain a reasonable expectation of privacy against the general public. He also suggests that "the case law is evolving" in favor of his argument. *See United States v. Hopkins*, 824 F.3d 726, 732 (8th Cir. 2016) (concluding that the combination of *Dunn* factors and daily experience supports a finding of curtilage in the area immediately in front of an apartment door in townhome complex); *People v. Burns*, 401 Ill.Dec. 468, 50 N.E.3d 610, 622 (2016) (concluding that a police officer's entry into a "locked apartment building at 3:20 a.m. with a drug-detection dog" was unlawful because the "investigation took place in a constitutionally protected area"). We are bound to follow our prior published opinions. *State v. M.L.A.*, 785 N.W.2d 763, 767 (Minn. App. 2010), *review denied* (Minn. Sept. 21, 2010). We may "overrule our own precedent if provided with a compelling reason to do so." *State ex rel. Pollard v. Roy*, 878 N.W.2d 341, 348 (Minn. App. 2016), *review denied* (Minn. Dec. 27, 2016). But because we see no compelling reason to overrule *Luhm*, we reject Edstrom's property-rights argument.

### B. Privacy-Rights Analysis

 Next, we consider Edstrom's argument that Sergeant Husevold and Officer Olson violated an area in which he had a legitimate expectation of privacy under the United States and Minnesota Constitutions.[2] Edstrom argues that the *Jardines* concurrence, which applied the privacy-rights analysis of the Fourth Amendment

in the context of that case, effectively abrogated the Minnesota Supreme Court's decision in *Davis*. *See* 569 U.S. at 12–15, 133 S.Ct. at 1418-20 (Kagan, J., concurring).

 The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 473, 142 L.Ed.2d 373 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (quotation marks omitted)); *accord Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). "A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 95-96, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) (quotations omitted).

In *Jardines*, the United States Supreme Court did not address the defendant's legitimate expectation of privacy, concluding that the "*Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." 569 U.S. at 1–13, 133 S.Ct. at 1411-18 (quoting *United States v. Jones*, 565 U.S. 400, 408-09, 132 S.Ct. 945, 951-52, 181 L.Ed.2d 911 (2012)). But in her concurrence, Justice Kagan reasoned that the warrantless use of a narcotics-detection dog also violates privacy rights because the police officers' use of the dog is similar to the use of "a device that is not in general public use, to explore details of the

---

**2.** Although we held that the warrantless use of a narcotics-detection dog immediately outside the door of a condominium unit inside a secured multi-unit building requires only a reasonable, articulable suspicion of criminal

activity, our decision was based solely on the property-rights analysis of the Fourth Amendment. *Luhm*, 880 N.W.2d at 609, 615-18 n.2 ("*Luhm* does not advance the theory on which the *Jardines* concurrence is based.").

home that would previously have been unknowable without physical intrusion." *Id.* at 1418-20 (Kagan, J., concurring) (quoting *Kyllo v. United States*, 533 U.S. 27, 40, 121 S.Ct. 2038, 2046, 150 L.Ed.2d 94 (2001) (quotation marks omitted)).

We recognize that a concurrence does not constitute binding precedent. *See Maryland v. Wilson*, 519 U.S. 408, 412-13, 117 S.Ct. 882, 885, 137 L.Ed.2d 41 (1997). But Justice Kagan's concurrence provides guidance on how courts should analyze a post-*Jardines* privacy-rights challenge under the Fourth Amendment.

A person's home clearly falls within the "zone of privacy" protected by the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 589-90, 100 S.Ct. 1371, 1381-82, 63 L.Ed.2d 639 (1980). Indeed, the home is where "privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986). A home may be a single-family house or, as here, a person's apartment. *Cf. Kentucky v. King*, 563 U.S. 452, 460, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) (treating an apartment as a home for purposes of the Fourth Amendment analysis). The Fourth Amendment protects persons from the warrantless use of sense-enhancing technology that is not in general public use to obtain "any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area." *Kyllo*, 533 U.S. at 34, 121 S.Ct. at 2043 (quotation omitted). "[D]rug-detection dogs are highly trained tools of law enforcement, geared to respond in distinctive ways to specific scents so as to convey clear and reliable information to their human partners." *Jardines*, 569 U.S. at 12–13, 133 S.Ct. at 1418 (Kagan, J., concurring) (citing *Florida v. Harris*, 568 U.S. 237, 240-41, 244-45, 133 S.Ct. 1050, 1053-54, 1056-57, 185 L.Ed.2d

61 (2013)). As Justice Kagan stated in her concurrence, "The police officers here conducted a search because they used a device . . . not in general public use (a trained drug-detection dog) to explore details of the home (the presence of certain substances) that they would not otherwise have discovered without entering the premises." *Id.* at 14–15, 133 S.Ct. at 1419 (quotations omitted).

Here, Officer Olson's narcotics-detection dog is certified and "trained to positively indicate the odor of various narcotics, including methamphetamine." Sergeant Husevold and Officer Olson sought details of the apartment that were not discernible to humans by using a narcotics-detection dog at the apartment door from the common hallway of the secured apartment building. And the dog positively alerted police officers to the presence of narcotics in the apartment, which they would not otherwise have been able to discover. We conclude that this warrantless intrusion into the apartment violated Edstrom's legitimate expectation of privacy.

The Seventh Circuit has similarly applied the privacy-rights analysis, articulated in the *Jardines* concurrence, to a dog sniff at a door inside a secured apartment building. *United States v. Whitaker*, 820 F.3d 849, 851-53 (7th Cir. 2016) (concluding that the "use of a drug-sniffing dog here clearly invaded reasonable privacy expectations, as explained in Justice Kagan's concurring opinion in *Jardines*," because the dog is a "super-sensitive instrument" for detecting objects and activities that humans cannot detect); *see also State v. Kono*, 324 Conn. 80, 152 A.3d 1, 15-16 (2016) (discussing the *Jardines* concurrence and *Whitaker*'s analysis but deciding the issue on state constitutional grounds).

We find the Seventh Circuit's analysis persuasive. *See Mahowald v. Minn. Gas*

*Co.*, 344 N.W.2d 856, 861 (Minn. 1984) (stating that decisions from foreign jurisdictions are not binding but may be persuasive authority). We also note that the Eighth Circuit declined to address the privacy-rights analysis post-*Jardines* only because it held that the warrantless use of a narcotics-detection dog at an apartment door was unlawful under the property-rights analysis.[3] *See Hopkins*, 824 F.3d at 732 ("The Supreme Court did not reach the expectation of privacy test ... and we need not rely on *Katz* ... to decide our case....").

Relying on *Illinois v. Caballes*, the state argues that the warrantless use of a narcotics-detection dog was lawful because Edstrom cannot have a legitimate expectation of privacy in contraband. 543 U.S. 405, 408, 125 S.Ct. 834, 837, 160 L.Ed.2d 842 (2005). We disagree. In *Caballes*, the United States Supreme Court reasoned that, because a person does not have a legitimate expectation of privacy in contraband, "the use of a well-trained narcotics-detection dog—one that does not expose non-contraband items that otherwise would remain hidden from public view—during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Id.* at 409, 125 S.Ct. at 838 (quoting *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (quotation marks omitted) (concluding police have authority to conduct a "canine sniff" of luggage located in public place based on reasonable suspicion, but that under circumstances of this case the detention was unreasonable)). But in *Caballes*, the Court was considering the narrow issue of whether reasonable suspicion was required to use a narcotics-detection dog to sniff the

exterior of a motor vehicle during a lawful traffic stop supported by probable cause. *Id.* at 406-07, 125 S.Ct. at 836-37. *Caballes* does not apply here because "people's expectations of privacy are much lower in their cars than in their homes." *Jardines*, 569 U.S. at 14 n.1, 133 S.Ct. at 1419 n.1 (Kagan, J., concurring); *see, e.g., Arizona v. Gant*, 556 U.S. 332, 345, 129 S.Ct. 1710, 1720, 173 L.Ed.2d 485 (2009); *New York v. Class*, 475 U.S. 106, 112-13, 106 S.Ct. 960, 965-66, 89 L.Ed.2d 81 (1986).

Thus, for purposes of the Fourth Amendment, we conclude that the use of a narcotics-detection dog at an apartment door inside a secured apartment building is unlawful absent a warrant or exception to the warrant requirement.

### C. State Constitutional Analysis

 We next consider whether the use of a narcotics-detection dog at an apartment door inside a secured apartment building is a search under article I, section 10, of the Minnesota Constitution. Edstrom contends that *Jardines* abrogated *Davis*. "While we may interpret the Minnesota Constitution to provide more protection than the [United States] Constitution, it may not afford less." *State v. McBride*, 666 N.W.2d 351, 361 (Minn. 2003). And Minnesota has a history of interpreting its state constitution to provide greater protection than the Fourth Amendment. *See, e.g., State v. Wiegand*, 645 N.W.2d 125, 135 (Minn. 2002) (concluding use of narcotics-detection dog to sniff exterior of motor vehicle during traffic stop for routine equipment violation required "reasonable, articulable suspicion of drug-related criminal activity"); *Ascher v.*

---

**3.** Edstrom also contends that the Eighth Circuit has not addressed the legality of a dog-sniff at an apartment door because it has chosen instead to apply the good-faith exception for reliance on judicial precedent. *See*

*United States v. Mathews*, 784 F.3d 1232, 1235 (8th Cir. 2015); *United States v. Hunter*, 770 F.3d 740, 742-43 (8th Cir. 2014). We do not address this argument because the state does not raise the good-faith exception.

*Comm'r of Pub. Safety*, 519 N.W.2d 183, 187 (Minn. 1994) (addressing temporary roadblocks for the purpose of discovering evidence of alcohol-impaired driving); *In re Welfare of E.D.J.*, 502 N.W.2d 779, 783 (Minn. 1993) (defining when a seizure has occurred). Consistent with Minnesota's history of providing greater protection to its citizens, we conclude that article I, section 10, of the Minnesota Constitution protects people from the warrantless use of a narcotics-detection dog at an apartment door inside a secured apartment building.

Before the United States Supreme Court's decision in *Jardines*, the Minnesota Supreme Court held, under the state constitution, that "police [only] need[ ] reasonable, articulable suspicion to use [a] narcotics-detection dog in the common hallway outside [an] apartment." *Davis*, 732 N.W.2d at 175. But the apartment building in *Davis* was not secured, and the supreme court signaled that it had "no opinion about what standard would be required if a defendant met her burden of proving that she has a reasonable expectation of privacy in the apartment building hallway." *Id.* at 179 & n.10. Because *Davis* did not address the use of a narcotics-detection dog in a *secured* residential building, it does not guide our decision.

We also conclude that *Jardines* has altered the relevant Fourth Amendment analysis by reflecting a greater concern with the intrusiveness of a narcotics-detection dog than was prevalent at the time of *Davis*. *Compare Davis*, 732 N.W.2d at 180 (describing a dog sniff at an apartment door as a "minimal intrusion"), *with Jardines*, 569 U.S. at 8–13, 133 S.Ct. at 1416-18 (comparing use of "trained police dog to explore the area around the home in hopes of discovering incriminating evidence" to "visitor exploring the front path with a metal detector" and concluding "government's use of trained police dogs to inves-tigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment"), *and id.* at 13–16, 133 S.Ct. at 1419-20 (Kagan, J., concurring) (quotation omitted) (stating that training a drug-detection dog "on a home violates our minimal expectation of privacy" (quotation omitted)).

■ In summation, we conclude that police officers' use of a narcotics-detection dog in the common area of a secured apartment building is a search under the Fourth Amendment and article I, section 10, of the Minnesota Constitution, which requires either a warrant or circumstances that justify an exception to the warrant requirement. The Fourth Amendment would be of little practical value to apartment dwellers if we held otherwise. *Cf. Jardines*, 569 U.S. at 6, 133 S.Ct. at 1414 (stating that a person's Fourth Amendment right "would be of little practical value" if police officers could stand on a porch or side garden and scan for evidence).

■ In this case, Sergeant Husevold and Officer Olson did not have a warrant to use the narcotics-detection dog to sniff outside the apartment. "Absent exigent circumstances and probable cause, or consent, a warrantless ... search of a private residence is *per se* unreasonable and violates the Fourth Amendment." *In re Welfare of B.R.K.*, 658 N.W.2d 565, 578 (Minn. 2003) (citing *Payton*, 445 U.S. at 590, 100 S.Ct. at 1382). Edstrom argues that the police lacked probable cause to conduct the dog sniff and that, absent probable cause and exigent circumstances, the search was unconstitutional. We agree.

"A police officer has probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Harris*, 568 U.S. at 243, 133 S.Ct. at 1055

(alterations in original) (quotations omitted). This is an objective inquiry, *State v. Koppi*, 798 N.W.2d 358, 363 (Minn. 2011), that "depends on the totality of the circumstances of the particular case, including the credibility and veracity of the informant." *State v. Munson*, 594 N.W.2d 128, 136 (Minn. 1999).

Here, Sergeant Husevold knew that a confidential informant told him that Edstrom possessed firearms and was selling methamphetamine out of an apartment. Sergeant Husevold verified that an emergency contact of Edstrom's lived in an apartment on the same floor identified by the informant and that Edstrom's vehicle was in the parking lot of that apartment building.

We may conclude that a confidential informant is reliable "if he or she has given reliable information in the past and if the police can corroborate the information provided by the confidential informant." *Luhm*, 880 N.W.2d at 621 (quoting *State v. Ross*, 676 N.W.2d 301, 304 (Minn. App. 2004) (quotation marks omitted)). The record does not indicate that this informant has provided reliable information in the past. And although "independent corroboration of even innocent details of an informant's tip may support a finding of probable cause," *Munson*, 594 N.W.2d at 136, we conclude based on the circumstances of this case that the police officers' corroboration is insufficient to support a probable cause finding to use the narcotics-detection dog to conduct a search at the apartment door. Absent probable cause, it is unnecessary to consider whether exigent circumstances existed. The dog's positive alert must be suppressed. *See State v. Jackson*,

742 N.W.2d 163, 177-78 (Minn. 2007) (stating "evidence seized in violation of the constitution must be suppressed"). And because the dog's positive alert was essential to the district court's probable cause determination for the warrant to search the apartment, we conclude that the district court erred by denying Edstrom's suppression motion.[4] *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963) (explaining that the exclusionary rule extends to indirect and direct products of unlawful searches).

## DECISION

The use of a narcotics-detection dog at the door of an apartment from the common area of a secured apartment building is a search under the Fourth Amendment and article I, section 10, of the Minnesota Constitution, which requires either a warrant or circumstances that justify an exception to the warrant requirement. Because the police officers lacked a warrant to use a drug-detection dog outside the apartment and no exception applies, the dog's positive alert must be suppressed. And because the dog's positive alert was essential to probable cause for the warrant to search the apartment, we conclude that the district court erred by denying Edstrom's suppression motion.

**Reversed and remanded.**

---

4. Edstrom also argues that the district court (1) abused its discretion by denying his request for in camera review of the informant's identity, (2) abused its discretion in excluding as hearsay statements that were not offered to prove the truth of the matter asserted, and (3) plainly erred by admitting evidence of the SWAT team's involvement in executing the search warrant of the apartment. Based on the outcome of this case, we do not address these arguments.